**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**MARCUS BOATNER,**

**Plaintiff,**

**v.**

**MXD GROUPS INC.,**

**Defendant.**

**Civil Action 2:17-cv-801**
**Magistrate Judge Jolson**

**OPINION AND ORDER**

This matter, in which the parties have consented to the jurisdiction of the Magistrate pursuant to 28 U.S.C. § 636(c) (Doc.56), is before the Court on Defendant MDX Group, Inc.'s Motion for Summary Judgment (Doc. 69) and Motion for Sanctions Pursuant to Rule 11 (Doc. 68). Fully briefed, the motions are ripe for decision. For the reasons that follow, the Motions are **DENIED.** In addition, and as explained below, the parties' remaining requests are **DENIED**.

## I. BACKGROUND

Defendant MDX Group, Inc. is a transportation and logistics company that contracts with its customers, often retailers, to coordinate deliveries. (Gamez aff., Doc. 69-3 at ¶ 5). It views its role as coordinating, rather than transporting, goods from manufacturers' or distributors' warehouses to the goods' final destination. (Brown aff., Doc. 69-4 at ¶¶ 5–7, 13). Defendant is "non-asset based," meaning it leases the facilities in which it operates and does not own any delivery trucks or trailers. (Gamez aff., Doc. 69-3 at ¶ 5). Instead, Defendant contracts with third parties to furnish the necessary equipment and staff to facilitate deliveries. (*Id.* at ¶ 13).

Defendant's Baton Rouge facility began this type of relationship with Plaintiff Marcus Boatner's company, AM Logistics, Inc. ("AM Logistics"), in March of 2015. (Boatner Dep., Doc.

67 at 25, 37–38, 109; Gamez aff., Doc. 69-3 at ¶ 6). To create the relationship, Plaintiff and Defendant executed two contracts, an Independent Truckman's Agreement and an Equipment Lease Agreement. (Boatner aff., Doc. 70-1 at ¶ 1, Ex. A).

At first, Plaintiff had only one truck. (Boatner Dep., Doc. 67 at 37). He drove every day, and his brother rode along to assist in the deliveries. (*Id.*). But this arrangement quickly changed. Defendant's Director of Operations, Felipe Gamez, asked Plaintiff to form another delivery team and offered Plaintiff assistance to do so. (Gamez aff., Doc. 69-3 at ¶ 1; Boatner Dep., Doc. 67 at 37). True to his word, Mr. Gamez helped Plaintiff acquire a second truck. (*Id.*). With two trucks, Plaintiff drove one, while his brother drove the other. Very soon thereafter, Mr. Gamez asked Plaintiff to acquire a third truck. (*Id.* at 37–38). Plaintiff obliged and, consequently, he transitioned into a supervisory role as AM Logistics hired additional drivers. (*Id.*). Plaintiff's evolution from driver to supervisor occurred within the span of about one month. (*Id.* at 37–38).

When Plaintiff moved into a supervisory role, he signed an "absentee driver's agreement" with Defendant. Plaintiff understood the agreement to mean that he was a business owner instead of a driver. (*Id.* at 109–10). In his new role, Plaintiff's daily tasks included getting to the facility at 5:00 a.m., helping his employees get prepared for the daily deliveries, and deciding which stops required his presence. (*Id.* at 110). The parties' relationship generally proceeded in this way until Defendant's Baton Rouge facility closed in September of 2015.

Roughly a year later, Plaintiff brought this lawsuit. (*See generally* Doc. 1). Plaintiff's complaint alleges the following causes of action: (1) failure to pay minimum wage in violation of the Fair Labor Standards Act ("FLSA"); (2) failure to pay overtime compensation in violation of the FLSA; (3) unlawful deductions from wages in violation of the FLSA and LA. RS. 23:635; (4) reimbursement of business expenses in violation of the FLSA and LA. R.S. 23:897; (5) failure to

keep accurate payroll records in violation of the FLSA and LA. R.S. 23:668; (6) failure to furnish accurate wage statements in violation of the FLSA and LA. R.S. 23:633; and (7) willful misclassification of Plaintiff as an independent contractor in violation of the FLSA, Louisiana Fair Pay Act of 2012 and LA. R.S. 23:1711(G)(A). (*Id.*). Underlying each claim is the question of whether Defendant misclassified Plaintiff as an independent contractor.

## II. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. 69)

Defendant makes two arguments for summary judgment: (1) Plaintiff's deposition testimony designating his relationship with Defendant as that of an independent contractor is dispositive; and (2) Plaintiff was correctly classified as an independent contractor, therefore, no genuine issue of material fact remains. (Doc. 69 at 15–20).

### A. STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the initial "responsibility of informing the district court of the basis for its motion, and identifying those portions" of the record that demonstrate "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)). A genuine issue of material fact exists if a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (defining "genuine" as more than "some metaphysical doubt as to the material facts"). Consequently, the

central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

**B. DISCUSSION**

As noted, Defendant moves for summary judgment on two bases.

**1. Plaintiff's Admission**

Defendant's first argument is simple. Defendant argues that Plaintiff's deposition testimony in which he agreed that he was an independent contractor is dispositive. (Doc. 69 at 15–16). Defendant admits, however, that it cannot cite any authority in support of this argument. After an independent search, the Court has not been able to uncover authority directly on point. But courts have held that a defendant's labels and designations regarding a plaintiff's classification are not dispositive or controlling. *See, e.g.*, *Keller v. Miri Microsystems LLC*, 781 F.3d 799, 806–07 (6th Cir. 2015) ("The Supreme Court has recognized . . . that businesses are liable to workers for overtime wages even if the company puts an independents contractor label on a workers whose duties follow the usual path of an employee" (citation, internal quotations, and alterations omitted)); *Solis v. Laurelbrook Sanitarium & Sch., Inc.*, 642 F.3d 518, 522 (6th Cir. 2011) ("Whether an employment relationship exists under a given set of circumstances 'is not fixed by labels that the parties may attach to their relationship nor by common law categories nor by classifications under other statutes.'" (quoting *Powell v. U.S. Cartridge Co.*, 339 U.S. 497, 528 (1950))). Moreover, workers cannot waive their FLSA rights. *Hall v. U.S. Cargo & Courier Serv., LLC*, 299 F. Supp. 3d. 888, 892 (S.D. Ohio 2018) ("The Sixth Circuit held that employees cannot waive their rights under the FLSA[.]" (citing *Killion v. KeHE Distribs., LLC*, 761 F.3d 574, 592 (6th Cir. 2014))). This authority indicates that labels or other designations, even those originating

from the worker, are not dispositive in the FLSA context. Consequently, Plaintiff's self-identification as an independent contractor, by itself, does not make or break this case.

**2. Economic-Realities Test**

Instead, this Court must consider the factual record as a whole to classify the relationship Plaintiff had with Defendant. The FLSA defines the term "employee" as "any individual employed by an employer," *id*. § 203(e)(1), and "employ" as "to suffer or permit to work," *id*. § 203(g). The definitions are "wide-ranging definitions; indeed, the Supreme Court has stated that '[a] broader or more comprehensive coverage of employees . . . would be difficult to frame.'" *Acosta v. Cathedral Buffet, Inc.*, 877 F.3d 761, 765 (6th Cir. 2018) (quoting *United States v. Rosenwasser*, 323 U.S. 360, 362 (1945)). As the Sixth Circuit has said, the FLSA statutory language "stretches the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles." *Cathedral Buffet*, 877 F.3d at 765 (quoting *Mendel v. City of Gibraltar*, 727 F.3d 565, 569 (6th Cir. 2013)).

To determine a worker's relationship with a company, the Sixth Circuit applies the "economic realities" test, which is "not a precise test susceptible to formulaic application." *Ellington v. City of E. Cleveland*, 689 F.3d 549, 555 (6th Cir. 2012) (citations omitted). Instead, the test "prescribes a case-by-case approach, whereby the court considers the circumstances of the whole business activity." *Id.* To guide the analysis, the Sixth Circuit has identified six factors to consider in applying the economic-realities test:

> 1) the permanency of the relationship between the parties; 2) the degree of skill required for the rendering of the services; 3) the worker's investment in equipment or materials for the task; 4) the worker's opportunity for profit or loss, depending on his skill; 5) the degree of the alleged employer's right to control the manner in which the work is performed; and 6) whether the service rendered is an integral part of the alleged employer's business.

*Keller*, 781 F.3d at 807 (quoting *Donovan v. Brandel*, 736 F.2d 1114, 1117 (6th Cir. 1984)). "No

one factor is determinative; a central question is the worker's economic dependence upon the business of which he is laboring." *Keller*, 781 F.3d at 807 (citations omitted). The Court considers each factor in turn.

a. Permanency of Relationship

The first factor, permanency of the relationship, looks to the "length and regularity of the working relationship between the parties." *Id*. The Sixth Circuit has explained that "[g]enerally, independent contractors have variable or impermanent working relationships with the principal company because they often have fixed employment periods and transfer from place to place as particular work is offered to them." *Id.* (internal quotation marks omitted). In contrast, "employees usually work for only one employer and such relationship is continuous and indefinite in duration." *Id.* (quotation marks and citation omitted); *see also Acosta v. Off Duty Police Servs.*, 915 F.3d 1050, 1057 (6th Cir. 2019) (same). The permanence factor often is supported by workers staying with a company for years, *id.*, but "even short, exclusive relationships between the worker and the company may be indicative of an employee-employer relationship," *Bey v. WalkerHealthCareIt, LLC*, 2:16-cv-1167, 2018 U.S. Dist. LEXIS 72819, at *23 (S.D. Ohio May 1, 2018) (citing *Keller*, 781 F.3d at 807).

Here, Defendant relies on Plaintiff's testimony that he was working as a motor carrier for Larry Pack and Mattress Firm prior to his engagement with Defendant and for Wayfair and Statewide Transportation after his termination. (Doc. 69 at 18). But what Plaintiff did before or after his relationship with Defendant makes no difference. Instead, to determine permanence, the law looks to "economic dependence" at a certain point of time, which means only concurrent work is indicative of independent contractor status. *See Off Duty Police Servs.*, 915 F.3d at 1058. Importantly, there is no evidence that Plaintiff made deliveries for these other entities at the same

time as he did for Defendant.

Defendant also notes that Plaintiff worked with Defendant for only five months. (*Id.*). Although five months is a relatively short tenure, "even short, exclusive relationships between the worker and the company may be indicative of an employee-employer relationship." *Bey*, 2018 U.S. Dist. LEXIS 72819, at *23. This Court's recent decision in *Bey* is instructive. In that case, the plaintiff was required to work at least forty-five hours per week while working on defendant's project, which the court found left "little time for her to have engaged in other employment"; thus, the time required supported a finding of exclusivity. *Id.* at *24.

Here, the record contains conflicting evidence regarding the numbers of hours Plaintiff worked. In his affidavit, Plaintiff swore that he worked ten to twelve hours a day (Boatner aff., Doc. 70-1 at ¶ 5). Plaintiff also relies on the affidavit of Thomasina Washington-Joseph, a former worker at the Baton Rouge facility, who swore that "drivers worked approximately 10 to 12 hours each workday on average." (Doc. 70-3 at ¶ 1, 9–12). Yet, during his deposition, Plaintiff seemed to say that he worked only six hours a day after he shifted to a supervisory role. (Boatner Dep., Doc. 67 at 110–11). That testimony, however, is far from clear. Consequently, it is uncertain whether the numbers of hours Plaintiff worked supports a conclusion of exclusivity.

Finally, there is conflicting evidence with regard to whether Defendant prohibited motor carriers from working with other companies. (*Compare* Gamez aff., Doc. 69-3 at ¶ 21; Brown aff., Doc. 69-4 at ¶ 32 *with* Washington-Joseph aff., Doc. 70-3 at ¶ 8). For all of these reasons, the permanency of the relationship remains in dispute.

b. Degree of Skill Required

The next factor considers the worker's skillset. This factor "must be evaluated with reference to the task[s] being performed." *Off Duty Police Servs.*, 915 F.3d at 1055 (quoting

*Donovan*, 736 F.2d at 1118).

Defendant relies on Plaintiff's own words to assert that Plaintiff's skills favor his classification as an independent contractor. (*See generally* Doc. 69 at 18–19). During his deposition, Plaintiff testified that he brought significant skills to his work, "including his perspective on assigning and routing routes among his driver teams and efficient and safe methods of completing deliveries." (Doc. 69 at 18).

There is, however, conflicting evidence regarding how much autonomy motor carriers had in scheduling deliveries. It is undisputed that motor carriers were able to staff their trucks without Defendant's input (*see, e.g.*, Gamez aff., Doc. 69-3 at ¶ 12), but who determined the sequencing of deliveries is less clear. Plaintiff testified that he scheduled heavier items in the morning and lighter items later in the day to account for his drivers' fatigue. (Boatner Dep., Doc. 67 at 33–34). Yet, in his affidavit, he swore that motor carriers had to ask for permission to alter the order of deliveries, even if doing so would be more efficient. (Boatner aff., Doc. 70-1 at ¶ 6; *see also* Green aff., Doc. 70-2 at ¶ 5). As such, the degree to which motor carriers were able to make decisions remains ambiguous.

Even more important, the core of Defendant's argument on this factor is that Plaintiff's work "was not work delivering loads for [Defendant's] customers but was instead, supervision." (Doc. 69 at 18). But Plaintiff's supervisory skills were developed in an alarmingly short period of time. In the span of one month, Plaintiff's delivery team grew from Plaintiff, his brother, and one truck, to three trucks and numerous drivers. (Boatner Dep., Doc. 67 at 37–38). This rapid training undercuts Defendant's argument that Plaintiff had specialized training.

Given the disputed and mixed facts, Defendant has failed to show that this factor should be resolved in its favor.

c. Investment in Equipment or Materials For the Task

The next factor "requires comparison of the worker's total investment to the company's total investment, including office rental space, advertising, software, phone systems, or insurance." *Off Duty Police Servs.*, 915 F.3d at 1056 (internal quotations omitted). "The capital investment factor is most significant if it reveals that the worker performs a specialized service that requires a tool or application which he has mastered." *Id.* (quoting *Brandel*, 736 F.2d at 1118–19). A limited investment in specialized equipment favors employee status. *Off Duty Police Servs.*, 915 F.3d at 1057.

Defendant represents that "it is undisputed that AM Logistics rented the three (3) trucks it operated for [Defendant] from Penske and [Defendant] was not a party to that contract." (Doc. 69 at 19). Defendant also notes that motor carriers are solely responsible for the trucks, insurance, and other equipment. (*Id.*; *see also* Brown aff., Doc. 69-4 at ¶ 27).

Again, the relationship is more nuanced than Defendant makes it seem. With regard to truck rental, Defendant used leverage as a national business to negotiate reduced rates with truck rental companies like Penske Truck Rental. (Brown aff., Doc. 69-4 at ¶ 19). If a carrier rented from a company like Penske, they could elect to have rental payments deducted directly from compensation due from Defendant for work performed, called "settlement statements." (*Id.* at ¶ 22). Defendant claims this program "often alleviated cash flow issues for the motor carriers and was offered as a convenience[,]" and if carriers opted in, they "were still the party on the invoice and, based upon [Defendant's] knowledge and belief, received invoices directly from Penske for charges assessed." (*Id.*). When Plaintiff started making deliveries for Defendant, he used a rental truck from Enterprise. (Boatner Dep., Doc. 67 at 43). Later, however, he was informed that he could get a better rate if he rented through Defendant and was instructed to return the Enterprise

truck and instead rent from Penske. (*Id.* at 43–44).

Similar to the Penske program, Defendant gave motor carriers the option to procure insurance through True North and IAT Insurance Group. (Brown aff., Doc. 69-4 at ¶ 26). Defendant's influence prompted these insurance companies to offer reduced premiums, lower deposit amounts, and lower deductibles to qualifying carriers. (*Id.* at ¶ 28). Defendant was an additional insured on the policies, and, in the event of a claim, Defendant would be notified and later informed of the outcome of the claims process. (*Id.* at ¶ 29). The amount owed either on the deductible or to remedy the issue could be deducted directly from Defendant's payments to the carrier. (*Id.*).

AM Logistics took advantage of Defendant's insurance program, and the insurance premiums were deducted from the company's settlement statements. (Boatner Dep., Doc. 67 at 42). Plaintiff says he signed the contract for insurance coverage the way Defendant told him to, and he understood that it was AM Logistics' policy with Defendant as an additional insured/certificate holder. (Boatner Dep., Doc. 67 at 42). Although Plaintiff's name was on the policy, the premiums and any insurance claims were processed exclusively through Defendant. (*Id.* at 46–49). Further, the insurance company, True North, informed Plaintiff that any claim had to be submitted by Defendant. (*Id.* at 54).

In one situation, when a tree fell on a truck Plaintiff was renting, Plaintiff attempted to pay the deductible on the insurance policy but was told that Defendant was a necessary intermediary. (*Id.* at 50). Although the policy was in Plaintiff's name, he was unable to make claims without Defendant's involvement. (*Id.* at 51). The charges were deducted from the "settlement checks" that Defendant paid to Plaintiff. (*Id.* at 50). Further, when Defendant terminated Plaintiff's contract, Defendant unilaterally canceled his liability insurance. (Boatner aff., Doc. 70-1 at ¶ 7;

*see also* Green aff., Doc. 70-2 at ¶ 6 (swearing that another motor carrier's insurance coverage was also canceled when he reported an on-the-job injury and Defendant terminated the carrier's contract.)). Consequently, Defendant's relationship with the insurance company undermines its contention that motor carriers were solely responsible for the trucks and equipment.

Moreover, the fact that Plaintiff rented the trucks and paid insurance premiums is not enough, standing alone, to sway this factor in Defendant's favor. This is so because analysis of this factor requires a comparison of the worker's investment to the company's investment. *See Off Duty Police Servs.*, 915 F.3d at 1056–57 (affirming district court's conclusion that worker's $3,000 to $5,000 investment "pal[ed] in comparison to" company's $200,000 investment). Here, the record is silent as to this comparison of expenses.

Based on all of this, the third factor is far from settled in Defendant's favor.

d. Worker's Opportunity for Profit or Loss Depending on Skill

The next factor asks whether the worker had "opportunities for profit or loss dependent on [their] managerial skill." *Off Duty Police Servs.*, 915 F.3d at 1059 (citations omitted). "Courts evaluate this factor by asking if workers could exercise or hone their managerial skill to increase their pay." *Id.* (internal quotations and citations omitted). A worker using managerial skill, for example, to improve efficiency and complete more jobs per day, is evidence of an independent contractor relationship. *Id.* (citing *Keller*, 781 F.3d at 813). It is evidence of an employment relationship if a worker has "no opportunity to increase [their] wages by working additional hours or taking on additional assignments." *See Bey*, 2018 U.S. Dist. LEXIS 72819, at *24. However, the mere opportunity to accept or reject work is not as significant as "whether workers could increase profits through managerial *skill*." *Off Duty Police Servs.*, 915 F.3d at 1059. Said simply, workers who are paid a flat rate for each job can make a profit by being more efficient and

managing different assignments. *Id.*

It is the Court's understanding that Defendant paid drivers by the delivery. It appears that drivers could not, by increasing efficiency, make more deliveries in a day and increase profits that way. However, the time in which the deliveries were completed was wholly dependent on the carrier's speed, so the level of compensation per hour was dependent on the motor carrier's efficiency. (Boatner Dep., Doc. 67 at 108). While not briefed, the Court assumes that Plaintiff was able to increase profits by operating three trucks rather than one or else he would not have done so. Accordingly, this factor supports finding an independent contractor relationship.

e. Control Over the Manner in Which the Work is Performed

For this factor, the question is "whether the company 'retains the right to dictate the manner' of the worker's performance." *Off Duty Police Servs.*, 915 F.3d at 1060 (quoting *Brandel*, 736 F.2d at 1119). Evidence of control includes a company's maintenance and policing of policies and procedures, noncompliance of which can result in adverse employment action. *Id.* Courts have also found the following indicia of control: (1) orientation and training; (2) determining work schedule and requiring approval for changes; (3) enforcing a dress code; (4) resolving transportation and location of employment issues; (5) conducting meetings; (6) assigning worker to specific manager; (7) requiring worker to perform work in certain location; and (8) terminating worker's participation on certain project without severing the entire engagement. *See Bey*, 2018 U.S. Dist. LEXIS 72819, at *24–25; *see also Williams v. King Bee Delivery, LLC*, 199 F. Supp. 3d 1175, 1180 (E.D. Ky. 2016) (applying *Keller* factors to deny motion to dismiss where company required delivery drivers to arrive at the facility at a certain time in the morning, wear uniforms, and keep track of deliveries made).

Importantly, close supervision is not necessary to establish control. *Off Duty Police Servs.*,

915 F.3d 1056. "The absence of need to control should not be confused with the absence of the right to control, and the actual exercise of control requires only such supervision as the nature of the work requires." *Id.* (citation and internal quotations); *see also Keller*, 781 F.3d at 815 (finding a fact issue existed about whether a company had the power to discipline and control its workers).

The evidence in this case cuts both ways, but the following facts show Defendant had a fair amount of control over motor carriers' day-to-day activities. Motor carriers were required to meet Defendant's "appearance requirements," by wearing company uniforms and placing Defendant's logo on their trucks. (Boatner aff., Doc. 70-1 at ¶ 6; Green aff., Doc. 70-2 at ¶ 5). Drivers were required to be present for mandatory meetings at 5:30 a.m. each day, to work at least five days a week, and to maintain and submit a daily log to Defendant. (*See* Washington-Joseph aff., Doc. 70-3 at ¶ 9). Defendant required documentation of background checks and authority to operate in interstate commerce for each of Plaintiff's drivers, and Defendant maintained compliance records . (Brown aff., Doc. 69-4 at ¶ 12; Boatner Dep., Doc. 67 at 99–100). Defendant did not have formal input in Plaintiff's hiring or firing decisions, but Plaintiff listened to complaints and addressed problems reported by Defendant. (Boatner Dep., Doc. 67 at 40). And, on at least one occasion, Plaintiff contends that Defendant's Operations Manager arranged for one of AM Logistics' drivers to work with another motor carrier without Plaintiff's permission. (Boatner aff., Doc. 70-1 at ¶ 9).

Further, as discussed with regard to the second factor, Plaintiff's autonomy in scheduling deliveries is disputed. *Supra* at Sec. II(B)(2)(b). The same is true for whether Defendant prohibited motor carriers from working with other companies. *Supra* at Sec. II(B)(2)(a). There is also a dispute of fact as to whether carriers were able to negotiate their contracts with Defendant. (Gamez aff., Doc. 69-3 at ¶ 21; Washington-Joseph aff., Doc. 70-3 at ¶ 6; Boatner aff., Doc. 70-1

at ¶ 6). Also, as discussed, Plaintiff was not able to make insurance claims without Defendant's involvement, premiums were deducted from Plaintiff's settlement checks, and Defendant unilaterally cancelled the policy upon Plaintiff's termination. *Supra* at Sec. II(B)(2)(c). Moreover, if Defendant is correct that procuring insurance for motor carriers was a barrier to entry and the cost "could be quite high," (Brown aff., Doc. 69-4 at ¶ 25), then revoking such coverage would at least deter carriers from working for other companies or negotiating their contracts.

In sum, Defendant has failed to carry its burden with regard to factor five.

f. Integral Part of the Business

"The more integral the worker's services are to the business, then the more likely it is that the parties have an employer-employee relationship." *Off Duty Police Servs.*, 915 F.3d at 1055. Relevant here, courts have not been persuaded by defendants' arguments that they merely serve as an agent between customers and service providers. *Id.* ("Even if that characterization were true, [defendant] could not function without the services its workers provide. . . . This factor cuts heavily in favor of finding an employment relationship . . . . ").

Defendant asserts that Plaintiff's "work performed during [the five months] was not work delivering loads for [Defendant's] customers but was instead, supervision of AM Logistics' own employees, at [Plaintiff's] sole discretion." (Doc. 69 at 18). Defendant goes on to say that because Plaintiff was performing services as a business owner for his own company and not delivering goods for Defendant, his services rendered were not an integral part of Defendant's business.

This argument concedes that delivering goods is integral to Defendant's business. Indeed, Defendant's role is to coordinate, consolidate, and stage freight for delivery within the warehouses it leases. (Brown aff., Doc. 69-4 ¶ 13). Plaintiff's daily tasks included getting to the facility before sunrise, helping his drivers get prepared for the daily deliveries, and deciding which stops required

his presence. (Boatner Dep., Doc. 67 at 110). As Plaintiff's services rendered were to coordinate and organize the delivery of items—an integral part of Defendant's business—the Court cannot resolve this factor in Defendant's favor.

***

In sum, genuine issues of material fact remain in determining the economic-reality factors. "The weight of these factors must be balanced in light of the FLSA's 'strikingly broad' definition of 'employee.'" *Off Duty Police Servs.*, 915 F.3d at 1062 (quoting *Keller*, 781 F.3d at 804 (citation omitted)). In this balancing, the Court must "remain mindful of the Supreme Court's instruction to avoid a narrow, grudging interpretation of the FLSA and to remember its remedial and humanitarian purpose." *Off Duty Police Servs.*, 915 F.3d at 1062 (quoting *Monroe v. FTS USA, LLC*, 860 F.3d 389, 403 (6th Cir. 2017) (citations and internal quotations omitted)). "To accomplish that purpose, the test must account for the full range of factors relevant to a worker's employment status." *Id.* Taking all these factors into consideration with an eye on the ultimate question of economic dependence, Defendant has not established that it is entitled to summary judgment.

## III. DEFENDANT'S MOTION FOR RULE 11 SANCTIONS (Doc. 68)

Defendant has asked this Court to sanction Plaintiff and his counsel, arguing that "[d]uring Plaintiff's deposition, he unambiguously testified that he believes he was a business owner and independent contractor and not an employee—the opposite of the allegations set forth in his Complaint." (Doc. 68 at 2). At base, Defendant argues Plaintiff's "allegations and contentions lack evidentiary support as required by Rule 11." (Doc. 82 at 1). As discussed at length, labels and representations carry little weight in FLSA misclassification analysis in the Sixth Circuit, and Defendant has failed to cite any authority supporting its argument that plaintiff's deposition

testimony identifying himself as an independent contractor is dispositive. In the Sixth Circuit, the test for imposing Rule 11 sanctions is whether the individual's conduct was reasonable under the circumstances. *Apostolic Pentecostal Church v. Colbert*, 169 F.3d 409, 417 (6th Cir. 1999). Here, where Plaintiff has presented sufficient evidence to survive Defendant's motion for summary judgment, the Court cannot find that Plaintiff's prosecution of this case was—or is—unreasonable.

## IV. REMAINING MATTERS

Throughout their briefing, the parties make multiple requests. Plaintiff requests the Court to take judicial notice of *Villalpando v. Exel Direct Inc.*, 12-cv-04137, 2015 U.S. Dist. LEXIS 118065 (N.D. Cal. 2015), and a pending Louisiana state court case, "*Green v. MDX Group, Inc. et al.*, NO. 649,775, section: 27 (19th Jud. Dist. Ct. Parish of E. Baton Rouge, La.)." (Doc. 70 at 10–13). For its part, Defendant asks this Court to take judicial notice of the minimum wage rate in 2015. (Doc. 69 at 13 n.9). Neither the cases nor the minimum wage rate were needed to resolve the Motions before the Court. Consequently, those requests are **DENIED**, without prejudice, as moot. If those materials become relevant as the case progresses, the parties are free to renew their requests.

Next, Defendant requests that Plaintiff's discussion of documents provided to the mediator on page seven of Plaintiff's Response in Opposition of Sanctions be stricken from the record. (Doc. 82 at 1). Although the Court appreciates Defendant's caution, this request is **DENIED** because the Court concludes that the identified language does not violate Local Rule 16.3(c).

Finally, Defendant asks this Court to strike Plaintiff's affidavit because, Defendant argues, the affidavit contradicts Plaintiff's deposition testimony. (Doc. 79 at 3–4). Specifically, Defendant asserts that Plaintiff's representations about the hours he worked do not match. In his

affidavit, Plaintiff swore that he "routinely worked 10 to 12 hours a day." (Doc. 70-1, ¶ 5). During his deposition testimony, he testified:

> Q: …so approximately how many hours then would you spend on a daily basis in your supervisory role.
> A: …So, ultimately roughly about six hours or so traveling between two of the guys…"
> Q: So, that's on a daily basis.
> A: Uh-huh.
> Q: So was that your workday then on a daily basis, six hours a day?
> A: Uh-huh.
> Q: And I believe you said your guys were running routes five to six days a week, is that correct?
> A: Uh-huh.

(Boatner Dep., Doc. 67 at 110–11). Defendant concludes this is contradictory because Plaintiff elsewhere testified that he no longer drove trucks after transitioning into a supervisory role. (Doc. 79 at 3–4 (citing *id.*)). So, Defendant argues, Plaintiff worked only six hours daily—not ten or more.

Although Plaintiff's representations call for clarification, the Court reads Plaintiff's testimony as confusing, not contradictory. For instance, the Court does not share Defendant's certainty that Plaintiff worked only six hours per day once he began supervising partially because "supervisory role" was not defined during the deposition. Further, at the beginning of his relationship with Defendant, Plaintiff was not in a supervisory role, and neither the affidavit nor the deposition testimony provides timeframes. Consequently, the affidavit does not directly contradict Plaintiff's deposition testimony, and Defendant's request to strike the affidavit is **DENIED**. *See Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 908 (6th Cir. 2006) (explaining what is required for a "direct contradiction").

## V. CONCLUSION

For the reason stated above, the Defendant's motion for Summary judgment (Doc. 69) is

**DENIED** and Defendant's Motion for Rule 11 Sanctions (Doc. 68) is **DENIED**. Likewise, the parties' remaining requests are **DENIED**.

In addition, the Court **SETS** the following trial-related deadlines:

- The parties shall file witness and exhibits lists with the Court on or before August 14, 2019.
- The parties shall file any pre-trial motions on or before August 21, 2019.
- The final pre-trial conference in this matter is **SET** for September 3, 2019. Counsel shall appear in person at 10:30 A.M. at the Joseph P. Kinneary United States Courthouse, 85 Marconi Boulevard, Columbus, Ohio 43215 in Room 228.
- Trial in this matter is **SET** to begin on September 9, 2019 at 9:00 AM at the Joseph P. Kinneary United States Courthouse, 85 Marconi Boulevard, Columbus, Ohio 43215 in Room 228.

IT IS SO ORDERED.

Date: May 2, 2019

/s/ Kimberly A. Jolson
KIMBERLY A. JOLSON
UNITED STATES MAGISTRATE JUDGE